# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 13, 2017     Decided December 22, 2017

No. 17-7003

UNITED STATES OF AMERICA, EX REL. LAURENCE SCHNEIDER,
ET AL.,
AND
LAURENCE SCHNEIDER,
APPELLANT

v.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01047)

*Joseph A. Black* argued the cause for appellant. With him on the briefs were *Daniel E. Cohen* and *Robert L. Di Marco*.

*Adam C. Jed*, Attorney, U.S. Department of Justice, argued the cause as *amicus curiae* United States supporting neither party. With him on the brief was *Michael S. Raab*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Robert D. Wick* argued the cause and filed the brief for appellees. *Michael M. Maya* entered an appearance.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Appellant Laurence Schneider – also called a Relator – brought a *qui tam* suit under the False Claims Act against JPMorgan Chase, alleging that Chase falsely claimed compliance with a Settlement it, and a number of other large banks, reached with the United States and state governments. The Settlement – and it is a massive one, costing Chase alone $1.1 billion of cash and over $4.2 billion of in-kind aid to consumers – resolved claims against the banks for alleged malfeasance in the origination and servicing of residential mortgages that were thought to contribute to the housing crash and subsequent financial crisis of 2008. It also contained detailed dispute resolution procedures and designated a Monitor to certify compliance with its terms. The district court approved the Settlement in 2012. Subsequently, the Monitor did certify that Chase had complied with the Settlement.

Appellant also alleged that Chase falsely claimed compliance with the Home Affordable Modification Program ("HAMP") administered by the Treasury Department.

Schneider challenges the district court's dismissal of his claims under the Settlement. The court concluded that he was required to exhaust his contentions pursuant to the procedures of the Settlement. He also disputes the district court's dismissal of

his HAMP claims, even though it was without prejudice; the district court thought his claim was defective because he did not allege that Chase committed *material* violations of the rules of the program, as would be necessary to make Chase's certification of compliance false.

We disagree with the district court's exhaustion conclusion, but we affirm its dismissal of the claims regarding the Settlement on a related basis. And we agree with the court's analysis of Appellant's HAMP claim.

## I.

The National Mortgage Settlement – which was negotiated in 2012 between a group of mortgage lenders and the federal government, the governments of forty-nine states, and the District of Columbia – released the lenders from liability for their past use of inappropriate practices with respect to the origination, servicing, and foreclosure of residential mortgages. In exchange for the release, the lenders agreed to provide billions of dollars of consumer relief and agreed to a set of standards to govern their future behavior.

The consumer relief consisted of forgiveness or modification of certain troubled loans – governed by guidelines in the Settlement[1] – for which the lender would receive "credits"

---

[1] Exhibit D provides detailed instructions for the type of relief that would be provided to different types of consumers, including specific sets of rules and relief rates for first and second lien mortgage modifications, transitional funds for homeowners engaged in a short sale or deed-in-lieu of foreclosure, short sales to provide "a dignified exit from a Property," Exhibit D § 4(a), deficiency waivers,

toward its obligations.  (As we noted, Chase, alone, assumed responsibility to provide over $4 billion of such relief.)  The Settlement designated a Monitor and charged him with working with the lenders to develop a work plan, make preliminary findings, and reach a final determination as to whether the obligations had been satisfied.

The servicing standards consisted of over 300 rules that governed the manner in which a lender would service its residential mortgages.  Included were such business practices as providing written acknowledgment of receipt of loan documentation, describing the loan modification process and applicable deadlines, notifying the borrower of any application deficiencies within 5 business days, and reaching a disposition of an application within 30 days of receipt of a complete submission. *See United States, et al., v. Bank of America, et al.*, 78 F. Supp. 3d 520, 524-25 (D.D.C. 2015).  The Settlement authorized the Monitor to determine whether Chase complied with those standards – and he did so.  He utilized "Metric" testing:  given the immense task of supervising the application of hundreds of standards to the many thousands of loans in question, the Settlement directed the Monitor to implement and perform statistical analyses to ensure that the banks – including Chase – had complied with particular rules within a certain statistical margin of error.

In the event that the Monitor were to discover an error, the Settlement contained detailed guidance directing that banks be notified and provided an opportunity to take corrective and remedial actions.  So long as the banks cured any such violation,

forbearance for unemployed borrowers, and anti-blight activities.

the Settlement precluded any party from suing under its terms. *See id.* at 528-31.

Relator, through companies he owns, purchased thousands of mortgage loans from Chase both before and after the housing crash. While servicing those loans, he discovered what he believes to be several violations of the Settlement.[2] These alleged mistakes involve a group of written-off loans, known by Chase as the "Recovery One population." In an administrative practice that began well before the financial crisis, Chase would transfer loans which it considered uncollectible from its main system of records into Recovery One. These loans were written off as an accounting loss – typically because the loan was "under water," which is to say that the amount owed exceeded the value of the mortgaged property. Schneider alleges even though loans were written off and presumably ignored, they still should have been serviced. It is undisputed, however, that "Chase disclosed the existence of [Recovery One] to the Monitor." Second Amended Complaint ¶ 184, JA 71. And although Relator alleges that Chase did not disclose the full

---

[2]Relator claims that Chase "forgave" numerous loans which it had *previously sold to him*. When reviewing the grant of a motion to dismiss, we, of course, must accept any well-pled allegations as true. However, the case before us does not involve any claims that Relator or his companies have in their individual capacities *vis-à-vis* Chase. Instead, we here consider Relator's *qui tam* claims on behalf of the governmental parties to the Settlement. To the extent that Chase sent notices to some mortgagors purporting to forgive loans actually owned by Relator, there is no factual assertion that Chase actually claimed credit from the Monitor for doing so – or that, in the event Chase did claim and receive some credit in error, that such credit exceeded the approximately $250 million buffer by which Chase overpaid its obligations.

number of loans held in Recovery One, *see id.*, he never alleges that Chase hid from the Monitor its position that those loans – regardless of their number – need not be serviced in accordance with the Settlement's standards.

Relator also asserts that he discovered evidence that Chase improperly claimed credit under its consumer relief obligations. But in his Final Consumer Relief Report, the Monitor stated that Chase had granted roughly $250 million of consumer relief above and beyond its requirement, for an overall total of $4.463 billion. Appellant does not assert that any such claims exceeded the $250 million cushion.

These allegations formed the basis of Appellant's *qui tam* suit. After the federal government declined to intervene on its own behalf – as is its prerogative under the False Claims Act, *see* 31 U.S.C. § 3730(b)(4) – Relator filed a First, and then a Second, Amended Complaint in the district court below.

The nub of Appellant's suit, regarding the Settlement, is that the Monitor's decision that Chase had complied was incorrect because Chase falsely certified that it had complied. Appellant alleges that damages are due to the United States and various state governments based on potential penalties for lender violations set forth in the Settlement – damages out of which, under the False Claims Act, he is entitled to a share. Similarly, Appellant asserted that Chase falsely claimed to have complied with HAMP's requirements, and hopes to claim a share of the government's damages for those violations as well.

The district court granted Chase's motion to dismiss on both sets of claims. It agreed with Chase's argument that Appellant could not bring Settlement-based claims without first exhausting the Settlement's dispute resolution procedures, holding that

"Relator, who acts on behalf of the United States, is . . . bound to [the Settlement's] terms in any complaint of noncompliance." Since the exhaustion issue is dispositive of the Settlement-related claims, the district court did not address Chase's alternative argument that Relator's suit constituted an improper collateral attack on a judgment committed to the Monitor's discretion by the Settlement.

The district court then also dismissed the HAMP claims because the Appellant did not sufficiently allege *material* noncompliance in the complaint. Although it dismissed the Settlement-related claims with prejudice (Relator had already filed two amended complaints), the district court chose to dismiss the HAMP claims without prejudice – thus allowing Relator to amend his claim to allege material noncompliance with HAMP if he is able to do so.

Relator here appeals these judgments of the district court. We, of course, review its dismissal of his claims *de novo*.

## II.

We agree with Appellant – and with the United States government, which filed an amicus brief – that the district court's determination that he was obliged to exhaust his claims under the Settlement's dispute resolution procedures was misconceived. Although he purported to represent the United States under the False Claims Act once he filed suit, he had no standing at all before he filed suit. He thus could hardly have exhausted the Settlement's dispute resolution procedures; by the time he had standing to do so, it was already too late. Chase contends that he could have asked the government to exhaust, but that is just another way of claiming that Appellant has no right to independently file a false claim suit.

That brings us to Chase's alternative argument that Appellant's suit is nothing more than a collateral attack on the Monitor's determination. Chase goes so far as to argue that the Settlement's dispute settlement procedures are the exclusive means to challenge any bank's behavior regarding compliance – and that would preclude *any* false claims suit based on the Settlement. Although the government takes no position on the merits, its position on exhaustion necessarily assumes that a false claim suit may be brought independent of the Settlement. Conceptually, according to the government, a false claim suit is different – it has a broader reach – than an action to enforce a contract. Naturally, Appellant makes the same conceptual argument. We need not decide that issue, however, because if any act could form the basis of a false claim suit, it certainly is not presented by this case.

That is so because Appellant ultimately only challenges the Monitor's legal determination that Chase complied with the Settlement. Although Schneider's original complaint included a number of allegedly false statements by Chase to the Monitor – which might have been problematic – his amended complaint dropped all of those claims. So even assuming that false or deceptive statements could serve as the basis of a False Claims Act suit outside the scope of contract dispute procedures, such allegations are not before us.

In that regard, Appellant's claim that Chase violated the consumer relief provisions of the Settlement is largely predicated on the notion that the banks were obliged to conduct an application process in order to determine who was entitled to receive consumer relief, whereas Chase made that decision unilaterally. But the Settlement does not require any application process in its otherwise-detailed guidelines for granting consumer relief. Indeed, such a reading would place all of

Chase's fellow lenders in noncompliance with the Settlement, since none of the other parties used the type of application process that Relator suggests was necessary. Be that as it may, the decisive point is that the Monitor was aware of the practices and concluded that Chase was in compliance. And to the extent that Relator vaguely alleges that Chase sought credit for loans that otherwise did not qualify for relief under the Settlement, the complaint nowhere identifies any ineligible loan Chase submitted for credit, alleges that the Monitor was unaware of any such loan's disqualifying characteristics, or claims that the cumulative value of any such loans exceeded the $250 million buffer we discussed above.

Although our conclusion is sufficient to affirm the district judge's dismissal of the Settlement-related claims, we should also note that Appellant's claims that Chase violated the servicing standards has an additional fatal flaw. The False Claims Act requires a fraud claim that is "material to an *obligation* to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G) (emphasis added); *see also id.* § 3729(b)(3) (defining an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual . . . or similar relationship").

Yet Chase's potential exposure to penalties for noncompliance with the Settlement's servicing standards is nothing more than a contingent possibility. As Chase notes, the Settlement contains a series of steps before Chase could be penalized for violating the servicing standards, including the Monitor's citation, failure to cure, failure of informal dispute resolution, and the filing of a suit in the district court. And even once a suit has been filed, Exhibit E of the Settlement places enforcement within the discretion of the district judge. According to the terms of the Settlement, the "relief available in

such an action will be" either "non-monetary equitable relief, including injunctive relief . . . or other non-monetary corrective action," or "Civil Penalties," which the Court "*may* award." Exhibit E § J.3 (emphasis added). Any hypothetical monetary penalty arising from this highly contingent outcome can hardly be described as an "obligation" under the False Claims Act.

Indeed, we have previously held that contingent exposure to penalties which may or may not ultimately materialize does not qualify as an "obligation" under the statute. *See Hoyte v. American National Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008) ("[A]n unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim."). And we agree with our sister circuits that Congress confirmed our *Hoyte* holding when it revisited the False Claims Act in 2009 and modified its language to require that an obligation be "established." *See Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1038 (5th Cir. 2016) (stating that the statutory change "confirmed the accepted holding that contingent penalties are not obligations under the FCA"); *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017). Actually, this uncertain-penalty problem may also apply to the consumer relief claims, but Chase did not make that argument before us, so we do not consider it.[3]

## III.

Turning to Appellant's HAMP claims, he argues that the district court failed to draw available inferences from ambiguous

---

[3]The penalties for failure to meet the consumer relief requirements are somewhat less contingent than those of the servicing standards.

sections of his Second Amended Complaint. Further, he contends that Chase did not argue before the district court, as it does before us, that the Settlement released Chase from liability for HAMP violations through February 2012 – and Chase, therefore, does waive that argument for purposes of this case.

Relator is, of course, correct that at this stage of litigation, ambiguities must be resolved in his favor. But we cannot ignore a fatal gap in his complaint. We agree with the district judge that the Relator "fails to state a claim that Defendant falsely certified HAMP compliance because he does not allege, with factual allegations in support, that the certifications were materially false." We, therefore, have no need to consider the waiver issue. We defer to her decision, however, not to dismiss Relator's HAMP claims with prejudice. To the extent he is able to amend those claims to plausibly allege material violations of Chase's HAMP obligations, he may do so.

For the above reasons, we affirm the dismissal of both claims, and remand the HAMP claims to the district court for proceedings consistent with this opinion.

*So ordered.*