22-1615-cv
*Miller v. United States, Citibank, N.A.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2023

(Argued: September 18, 2023    Decided: August 6, 2024)

Docket No. 22-1615-cv

TAMIKA MILLER, INDIVIDUALLY,
*Plaintiff-Appellant,*

*- against -*

UNITED STATES OF AMERICA EX REL. TAMIKA MILLER,
*Plaintiff-Appellee,*

CITIBANK, N.A.,
*Defendant-Appellee.*[*]

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

CHIN, NARDINI, and NATHAN, *Circuit Judges.*

---

[*]    The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

Appeal from a judgment of the United States District Court for the Southern District of New York (Cote, *J.*), granting defendant-appellee's motion to dismiss the complaint in this False Claims Act case for failure to state a claim and denying plaintiff-appellant relator's motion for a share of a monetary award obtained by the government in administrative proceedings. The district court concluded that the relator failed to state a "reverse false claim" because she failed to allege an "obligation" to pay the government, as required by the False Claims Act, and also because her complaint failed to meet the particularity requirement of Federal Rule of Civil Procedure 9(b).

AFFIRMED.

CLEVELAND LAWRENCE III (Richard E. Condit, C. Ezra Bronstein), Mehri & Skalet, PLLC, Washington, D.C., and Robert J. Valli, Jr., Valli Kane & Vagnini LLP, Garden City, NY, *for Plaintiff-Appellant*.

NICOLE A. SAHARSKY (Lucia Nale, Debra Bogo-Ernst, Hans J. Germann), Mayer Brown LLP, Washington, D.C., and Chicago, IL, *for Defendant-Appellee.*

REBECCA S. TINIO, Assistant United States Attorney (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*), *for* Damian Williams, United States Attorney for the Southern

CHIN, *Circuit Judge*:

In 2019, plaintiff-appellant Tamika Miller filed this *qui tam* action under the False Claims Act (the "FCA"), 31 U.S.C. § 3729 *et seq.*, against defendant-appellee Citibank, N.A.[1] Miller contends that Citibank violated consent orders it had entered into in 2015 by hiding failures in its management of third-party risks. Citibank did so, she asserts, to avoid paying regulatory fines and penalties, thereby depriving the United States of monies it otherwise would have been paid -- a "reverse false claim." In June 2020, after investigating the matter, the United States declined to intervene. In October 2020, Citibank entered into a different consent order with the Office of the Comptroller of the Currency (the "OCC") and was required to pay a $400 million civil penalty. In January 2022, Miller moved for an order awarding her a share of that penalty. While that motion was pending, Citibank moved to dismiss Miller's complaint.

---

[1] Miller initially sued Citigroup, Inc., Citibank, N.A., and "Citibank, Inc." (a non-entity), asserting four claims. She later consented to the dismissal of three of the four claims as well as all claims against Citigroup, Inc. and "Citibank, Inc." Hence, in this opinion we address only the one remaining claim against Citibank, N.A. ("Citibank").

On June 22, 2022, the district court (Cote, *J.*) addressed both motions. As to Miller's motion for a share of the $400 million civil penalty, the court noted that "the $400 million award of which the Relator seeks a share does not appear to be an 'alternate remedy' for the *qui tam* claim asserted in the complaint." *United States ex rel. Miller v. Citigroup Inc.*, No. 19-cv-10970 (DLC), 2022 WL 2237619, at *2 (S.D.N.Y. June 22, 2022) (quoting 31 U.S.C. § 3730(c)(5)), *recons. denied*, No. 19-cv-10970 (DLC), 2022 WL 3030707 (S.D.N.Y. Aug. 1, 2022). It further observed that the order accompanying the OCC's 2020 penalty did "not appear to relate to any of the misconduct alleged in the complaint." *Id.* The district court then held, however, that Miller's request had to be denied "regardless" because she had failed to sufficiently plead a reverse false claim. *Id.* The district court therefore granted Citibank's motion to dismiss and denied Miller's motion for a share of the $400 million penalty.

Miller appeals from both rulings, as well as from the district court's denial of her request for leave to amend her complaint. For the reasons set forth below, we affirm.

*BACKGROUND*

As we must when reviewing a district court's grant of a motion to dismiss, "we accept the material facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff" -- here, Miller. *In re: Nine W. LBO Sec. Litig.*, 87 F.4th 130, 140 (2d Cir. 2023).

## I.     *The Facts*

The following facts are drawn primarily from Miller's complaint, with the addition of certain undisputed facts.

### A.     The Parties

Citibank is a global bank that is the world's largest issuer of credit cards.  It uses third-party vendors to provide services to its credit card customers.  To monitor these third-party vendors and ensure compliance with applicable laws, regulations, and consent orders, Citibank created a third-party risk management department.  Citibank's operations are subject to regulation by various federal agencies, including the OCC and the Consumer Financial Protection Bureau (the "CFPB").

Miller is a vice president at Citibank who has worked in the bank's third-party risk management department since 2014.  She audits third-party

vendors and suppliers that service Citibank's credit card division. Miller conveys the results of her audits -- as well as her observations and findings -- to senior managers through a type of report called an external executive summary report.

## B.     The 2015 Consent Orders

In July 2015, Citibank entered into one consent order with the CFPB and one consent order with the OCC. Citibank's consent order with the CFPB (the "2015 CFPB Order") addressed the bank's alleged deceptive acts or practices related to its credit-card business, including marketing, membership retention, and debt collection. Citibank's consent order with the OCC (the "2015 OCC Order" and, together with the CFPB Order, the "2015 Consent Orders") addressed the bank's billing practices tied to its identity protection products and marketing and sales practices linked to its debt cancellation products. The OCC terminated the 2015 OCC Order in 2018 after concluding it was no longer necessary.[2]

## C.     The Purported Violations

In January 2016, Citibank created an auditing procedure for third-party vendors and suppliers called TPORT -- housed within its third-party risk

---

[2]      The CFPB Order was not terminated at the same time and apparently remains in effect.

management department -- to comply with federal regulations and consent orders. Miller and her colleagues implemented TPORT. During the course of her work, however, Miller noticed that TPORT's questions and scoring criteria had been altered to downplay compliance violations -- permitting the violations to evade mandatory reporting to the government. Her superiors discovered how to bypass TPORT's internal controls and hide issues that should have resulted in failed audits of third-party suppliers and vendors.

In 2018, Miller "witnessed, firsthand, her audit reports regarding violations with the [2015 Consent Orders] and agency guidelines, being altered" to show more favorable results. J.A. at 26. She observed "senior Citibank management suppressing [a]udit findings, altering reviews and minimizing audit observations." *Id.* at 27. She also observed a conflict of interest in the structure of her department that incentivized her managers to suppress failed audits. In December 2018, Miller reported these violations to Citibank's ethics department, which informed her on February 19, 2019, that it did not find any violations.

In July 2019, Miller reported her concerns about Citibank to the OCC, using its whistleblower website, and discussed her concerns with OCC representatives.

### D. The 2020 Consent Order

On October 2, 2020, some two years after the termination of the 2015 OCC Consent Order, Citibank entered into a new consent order with the OCC (the "2020 OCC Consent Order") "for deficiencies in its data governance, risk management, and internal controls that constitute unsafe or unsound practices" and was required to pay a $400 million fine (the "2020 OCC Penalty"). J.A. at 171. The factual findings underpinning the consent order did not mention risk management for third parties or refer to third-party suppliers or vendors -- the subject of Miller's complaint in this case.[3]

## II. *Procedural History*

On November 26, 2019, Miller filed this *qui tam* action alleging violations of the 2015 Consent Orders and applicable laws. The *qui tam* complaint asserted three claims under the FCA and one claim under the

---

[3] Miller did not reference the 2020 OCC Consent Order in the complaint because it was not yet in existence. Her motion for a share of the 2020 OCC Penalty, however, references the 2020 OCC Consent Order.

- 8 -

Financial Institutions Recovery, Reform and Enforcement Act. Miller alleges that Citibank hid third-party compliance failures that violated the 2015 Consent Orders and the "Government's guidance" by altering her reports, implementing a reporting structure rife with conflicts of interest, and tampering with TPORT, the internal audit procedure. J.A. at 25-27. Citibank's actions, she claims, permitted the bank to avoid paying the government at least $150 million in fines or penalties.

In June 2020, the government declined to intervene in the instant action, and the complaint was unsealed and served on Citibank.

On January 31, 2022, Miller moved in this case for an order directing the United States to award her a share of the 2020 OCC Penalty under the FCA's alternate remedy provision on the theory that the information she provided to the OCC was "instrumental" to securing the 2020 OCC Penalty. J.A. at 78. The government opposed the motion.

On March 25, 2022, before responding to Miller's motion for a share of the 2020 OCC Penalty, Citibank moved to dismiss the *qui tam* complaint. On May 13, 2022, in her memorandum of law in opposition to Citibank's motion to

dismiss, Miller voluntarily dismissed three of the four claims in her complaint, leaving only her reverse false claim under 31 U.S.C. § 3729(a)(1)(G).

On June 22, 2022, the district court granted Citibank's motion to dismiss and denied Miller's motion for a portion of the penalty. The district court observed that, "[a]s an initial matter," the $400 million of which Miller sought a share did "not appear to be an 'alternate remedy' for the *qui tam* claim asserted in the complaint." *Citigroup*, 2022 WL 2237619, at *2 (quoting 31 U.S.C. § 3730(c)(5)). The district court concluded that while Miller's complaint alleged that Citibank suppressed audits showing third-party compliance failures, in violation of the 2015 Consent Orders and federal law, the OCC obtained the $400 million penalty from a different consent order -- the 2020 OCC Consent Order -- for conduct unrelated to oversight of third parties. *Id.* Accordingly, the district court was of the view that the 2020 OCC Penalty was not related to the reverse false claim asserted in the complaint. *Id.*

The district court determined, however, that Miller's request for a share of 2020 OCC Penalty "must be denied regardless, . . . because she has failed to state a claim." *Id.* Specifically, the district court concluded Miller's complaint failed to state a reverse false claim because (1) it did not allege that Citibank had

any "obligation" to pay the government within the meaning of the FCA and (2) it failed to satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b). *Id.* at *3-4. Finally, the district court denied Miller's request for leave to amend after concluding that the deficiencies in the complaint could not be cured by amendment because they were based on a misunderstanding of the law. *Id.* at *4-5. Judgment was entered on June 22, 2022. Miller moved for reconsideration and filed a proposed amended complaint, and on August 1, 2022, the district court denied that motion.

This appeal followed.

## *DISCUSSION*

Miller contends that she adequately alleged an obligation to pay by stating that Citibank violated the 2015 Consent Orders, which therefore subjected Citibank to a mandatory penalty, and she met the particularity requirement of Rule 9(b) by describing the fraud in sufficient detail. Miller argues that after declining to intervene in her *qui tam* action, the government sought an alternate remedy that resulted in the 2020 OCC Penalty. Accordingly, she claims she has a right to a share of the 2020 OCC Penalty. She further argues that, if her

complaint contained deficiencies, the district court should have granted her leave to amend.

## I.      *Standard of Review*

We review *de novo* a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6), accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *See In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 159 (2d Cir. 2021). "To survive a motion to dismiss, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 104 (2d Cir. 2021) (quoting *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 176 (2d Cir. 2019)).

We review *de novo* a district court's denial of a relator's motion for a share of the recovery arising from the government's pursuit of an alternate remedy under 31 U.S.C. § 3730(c)(5). *See United States v. L-3 Commc'ns EOTech, Inc.*, 921 F.3d 11, 18 (2d Cir. 2019). "We review a district court's denial of leave to amend for abuse of discretion, unless the denial was based on an interpretation of law, such as futility, in which case we review the legal conclusion *de novo*." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

Finally, we review for abuse of discretion a district court's denial of a motion for reconsideration. *Cho v. Blackberry Ltd.*, 991 F.3d 155, 162 (2d Cir. 2021).

## II. Applicable Law

The resolution of Miller's claim involves provisions of the FCA, the penalty structure of the Federal Deposit Insurance Act, and the heightened pleading standard for fraud claims contained in Federal Rule of Civil Procedure 9(b). We discuss each in turn.

### A. The FCA

#### 1. Overview

Miller alleges that Citibank engaged in fraudulent practices that violate the FCA. The FCA "imposes significant penalties on those who defraud the Government." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 180 (2016). Both the government and private parties may enforce the FCA. Private parties, called relators, do so by filing civil *qui tam* actions "in the name of the Government." *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015)).

- 13 -

"[T]he relator is no ordinary civil plaintiff" and, accordingly, "is immediately subject to special restrictions." *United States*, *ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 425 (2023). For example, when the relator commences a *qui tam* action, the relator must file the complaint under seal and serve it on the government. *Id.*; 31 U.S.C. § 3730(b)(2). The government has 60 days to decide whether to intervene in the relator's action, 31 U.S.C. § 3730(b)(2), although this deadline may be extended, *id.* § 3730(b)(3). If the government intervenes, it "shall have the primary responsibility for prosecuting the action," though the relator "shall have the right to continue as a party to the action . . . ." *Id.* § 3730(c)(1); *see also id.* § 3730(b)(4)(A) (providing that after intervening, "the action shall by conducted by the Government"). If the government declines to intervene, the relator "shall have the right to conduct the action." *Id.* § 3730(b)(4)(B), (c)(3).

Under either scenario, in successful *qui tam* actions, the statute generally provides the relator with a portion of the amount recovered from the defendants "[t]o incentivize private persons to uncover, report, and prosecute FCA claims for the benefit of the United States." *L-3 Commc'ns*, 921 F.3d at 14. The relator's share of any recovery varies, depending in part on the government's

role in the prosecution. *See* 31 U.S.C. § 3730(d)(1)-(2) (granting the relator up to 30% of any government recovery).

### 2. *The Alternate Remedy Provision*

Yet another option is available to the government in response to a relator's filing of a *qui tam* lawsuit: it may decline to intervene and still "elect to pursue its claim through any alternate remedy available" to it. *Id.* § 3730(c)(5). The "alternate remedy" provision provides, in relevant part:

> Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

*Id.*[4]

This Court has previously concluded that the alternate remedy provision "entitles a person who brought a *qui tam* action to share in the recovery

---

[4] While the FCA does not define the term "alternate remedy," this Court has concluded that it must include the government's ability to initiate its own FCA lawsuit. *L-3 Commc'ns*, 921 F.3d at 28. "Federal prosecutors may of course sue an alleged violator, all on their own." *Polansky*, 599 U.S. at 424. As we explained in *L-3 Communications*, a relator's *qui tam* action would likely be stayed while the government pursued an alternate remedy. *See* 921 F.3d at 29-30.

gained by the government in a proceeding it has pursued as an alternative to the *qui tam* action, if the relator's *qui tam* action was pending when the government was choosing what course to pursue." *L-3 Commc'ns*, 921 F.3d at 30. There, the relator voluntarily dismissed his *qui tam* action against a company more than a year before the government commenced its own FCA lawsuit against the same company. *See id.* at 13, 16. After the government obtained a $25.6 million recovery, the relator sought a share of that recovery. *Id.* at 16. We concluded that "[a]s there was no existing *qui tam* action because [the relator] voluntarily dismissed his action, § 3730(c)(5) does not entitle him to share in the government's recovery in its own subsequent proceeding." *Id.* at 30.

3.    *The Reverse False Claim Provision*

Miller brought this *qui tam* action under the FCA's reverse false claim provision, which "covers claims of money *owed* to the government, rather than payments *made* by the government." *Foreman*, 19 F.4th at 119 (emphasis in original) (quoting *United States ex rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 368 (S.D.N.Y. 2014)); *see also* 31 U.S.C. § 3729(a)(1)(G). That provision imposes civil liability on any person who:

> knowingly makes, uses, or causes to be made or used, a
> false record or statement material to an obligation to

> pay or transmit money or property to the Government,
> or knowingly conceals or knowingly and improperly
> avoids or decreases an obligation to pay or transmit
> money or property to the Government . . . .

31 U.S.C. § 3729(a)(1)(G).

Congress amended the reverse false claim provision in 2009, adding the phrase "or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 253 (3d Cir. 2016) (quoting 31 U.S.C. § 3729(a)(1)(G)). The reverse false claim provision, as amended, thus contains three theories of liability: (1) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," (2) "knowingly conceal[ing] . . . an obligation to pay or transmit money or property to the Government," and (3) "knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government . . . ." 31 U.S.C. § 3729(a)(1)(G).

Not all three theories require an affirmative misrepresentation. *See id.* (imposing liability on any person who "knowingly and improperly avoids or decreases an obligation to pay . . . the Government"); *Customs Fraud*

- 17 -

*Investigations*, 839 F.3d at 255 (noting that "[a] false statement is no longer a required element" of a reverse false claim after the 2009 amendments). Under any theory of a reverse false claim, however, the relator must allege an "obligation" to pay money or property to the government.

The reverse false claim provision defines an "obligation" as "an established duty, whether or not fixed, arising from" enumerated sources, including a contractual relationship, a statute, or a regulation. 31 U.S.C. § 3729(b)(3). Accordingly, the existence of a cognizable "obligation" turns on whether a duty is "established" -- or "whether there is *any* duty to pay." *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016) (emphasis in original); *see also United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230-31 (10th Cir. 2017) ("For our purposes, 'established' is the key word in this definition.").

**B.    Penalties Under the Federal Deposit Insurance Act**

Miller claims that Citibank has a duty to pay under the Federal Deposit Insurance Act (the "FDIA"), 12 U.S.C. § 1811 *et seq.* The FDIA provides that an "appropriate [f]ederal banking agency" has the authority to issue cease-and-desist orders to any insured depository institution that it believes "is

engaging or has engaged . . . in an unsafe or unsound practice in conducting [its] business . . . or is violating or has violated . . . a law, rule, or regulation." 12 U.S.C. § 1818(b)(1). The OCC is one such appropriate federal banking agency. *Id.* § 1813(q)(1) (providing that the OCC is an "appropriate [f]ederal banking agency" for "any national banking association[,] any [f]ederal branch or agency of a foreign bank[,] and any [f]ederal savings association").

The OCC also has the authority to impose civil money penalties for violations of its cease-and-desist orders. *Id.* § 1818(i)(1)-(2). Specifically, while the amount of the penalty varies, "[a]ny insured depository institution which . . . violates any final order . . . issued pursuant to [provisions including 12 U.S.C. § 1818(b)] . . . *shall forfeit and pay* a civil penalty." *Id.* § 1818(i)(2)(A) (emphasis added). The statute also gives the OCC the ability, however, to "compromise, modify, or remit any penalty" and consider various mitigating factors in weighing the appropriateness of the penalty. *Id.* § 1818(i)(2)(F)-(G). Courts interpreting the "compromise, modify, or remit" language in an FCA case involving a different statute have concluded that the term "remit" means the agency "has discretion to impose . . . *no penalty at all*." *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 725-26 (D.C. Cir. 2019)

- 19 -

(emphasis added) (defining "remit" in the civil penalty provision of the Toxic Substances Control Act to mean to "pardon or forgive" (citation omitted)).

### C.  Rule 9(b)'s Heightened Pleading Standard

Finally, Miller's FCA claim implicates the heightened pleading standard for fraud claims contained in Federal Rule of Civil Procedure 9(b). Though plaintiffs must typically state a claim that is plausible on its face to survive a motion to dismiss, *see Foreman*, 19 F.4th at 104, claims under the FCA -- including reverse false claims -- are subject to the heightened pleading standard found in Federal Rule of Civil Procedure 9(b).  *Id.* at 119; *see also Chorches*, 865 F.3d at 81 ("*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b).").  Rule 9(b) provides, in relevant part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

To satisfy Rule 9(b), a complaint alleging fraud "ordinarily" must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Chorches*, 865 F.3d at 81 (quoting *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)); *accord United States*

*ex rel. Sibley v. Univ. of Chicago Med. Ctr.*, 44 F.4th 646, 655 (7th Cir. 2022) ("[T]he relators must describe the 'who, what, when, where, and how' of the fraud -- 'the first paragraph of any newspaper story.'" (quoting *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018))).  Rule 9(b) serves several purposes.  "[I]t is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).  It also discourages plaintiffs from using the litigation process to discover hypothetical wrongdoing.  *See Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (collecting cases).

Rule 9(b) imposes a "rigid requirement" of particularity that can only yield, permitting a *qui tam* plaintiff to make allegations based on information and belief, when those facts are "peculiarly within" the defendant's knowledge. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990); *see, e.g., Chorches*, 865 F.3d at 86 (concluding that billing details related to the submission of specific false claims to the government were "peculiarly within" the knowledge of the defendant ambulance company).

## III.    *Application*

We conclude that the district court did not err by dismissing Miller's complaint for failure to state a claim and that, therefore, the district court properly denied Miller's request for a share of the 2020 OCC Penalty.  The district court also did not err by denying Miller leave to amend her complaint.

### A.    Failure to State a Reverse False Claim under the FCA

Miller failed to state a reverse false claim for two independent reasons: (1) she failed to allege that Citibank had an obligation to pay the government and (2) she failed to plead with the particularity required by Federal Rule of Civil Procedure 9(b).

#### 1.    *Obligation*

As discussed above, a *qui tam* plaintiff does not state a reverse false claim if the defendant does not have an obligation -- that is, an established duty -- to pay the government.  *See* 31 U.S.C. §§ 3729(a)(1)(G), (b)(3).  The district court concluded that, although Miller "has asserted that Citibank violated applicable regulation[s] and consent orders, she has not plausibly alleged that these violations gave rise to any established payment obligation."  *Citigroup*, 2022 WL 2237619, at *4.  Thus, even assuming Citibank violated the 2015 Consent

- 22 -

Orders, Miller has not alleged that the government imposed a fine for those violations.

We have not previously considered when a duty is "established." But other circuit courts have concluded that a duty is *not* established when it "is dependent on a future discretionary act." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 505 (3d Cir. 2017). Such a future discretionary act exists when, for example, a statute gives an agency the ability to decide whether to impose a civil penalty for a violation of the law. *See Kasowitz Benson Torres*, 929 F.3d at 725-26 ("Because the [agency] can remit a civil penalty -- that is, 'pardon or forgive' it, . . . -- [the statute] does not create an obligation to pay a civil penalty at the moment of a statutory violation; an obligation arises only if and when the [agency] decides to impose a penalty."); *Barrick*, 878 F.3d at 1231 (concluding that "where government officials [are] afforded discretion to determine whether to charge fees," there is no liability under the reverse false claim provision).

In other words, our sister circuits have concluded that potential or contingent exposure to penalties does not create an "established" duty to pay

and, accordingly, an obligation does not exist by the mere fact of a violation.[5]

We agree.

An examination of the FCA's text -- the first step in any statutory interpretation inquiry -- supports this conclusion. *See Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 101 F.4th 176, 181 (2d Cir. 2024). Under the reverse false claim provision, a relator must plead the existence of an "obligation," 31 U.S.C. § 3729(a)(1)(G), which the FCA defines as "an established duty, whether or not fixed, arising from" enumerated sources, including statutes and regulations, *id.* § 3729(b)(3). While Congress added this definition of "obligation" in its 2009 amendments, it did not further define the word "established." *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1623 (2009).

---

[5]    *Barrick*, 878 F.3d at 1230-31 (collecting cases and noting that "there is no liability for obligations to pay that are merely potential or contingent"); *Kasowitz Benson Torres*, 929 F.3d at 725 ("[A]n unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim."); *United States ex rel. Schneider v. JPMorgan Chase Bank, Nat'l Ass'n*, 878 F.3d 309, 315 (D.C. Cir. 2017) ("Any hypothetical monetary penalty arising from this highly contingent outcome can hardly be described as an 'obligation' under the False Claims Act."); *Simoneaux*, 843 F.3d at 1040 ("[M]ost regulatory statutes . . . impose only a duty to obey the law, and the duty to *pay* regulatory penalties is not 'established' until the penalties are assessed." (emphasis in original)).

"Where, as here, there is no statutory definition of a term, we consider 'the ordinary, common-sense meaning of the words.'" *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000)). The prevailing dictionary definition of "establish" at the time of the 2009 amendments was "[t]o make secure or firm." *Establish* (def. 1), *Webster's New College Dictionary* (3d ed. 2008); *see also Establish* (def. 1), *Black's Law Dictionary* (9th ed. 2009) ("To settle, make . . ."). Here, "established" modifies "duty," and these definitions show that an "established duty" is one that is already secured or settled. And as the word "obligation" appears in the phrase "obligation to pay or transmit money or property to the Government," the "established duty" in question is a duty "to pay or transmit money or property to the Government."

Accordingly, a duty to pay is not established just because a violation of the law occurs when the decision to impose a fine is a matter of discretion. *See Simoneaux*, 843 F.3d at 1039 ("If . . . reverse-FCA liability could attach from the violation of any federal statute or regulation that imposes penalties[, then] [f]unctionally that means the FCA permits blanket trebling of all federal penalties, so long as the violator knowingly conceals his violation of the

regulation."). We hold that a duty to pay is "established" only when it triggers an immediate and self-executing duty to pay. In contrast, a duty to pay is not established -- and there is no cognizable "obligation" under the reverse false claim provision -- when the imposition of penalties depends on government discretion. *See, e.g., Petras*, 857 F.3d at 505. There is no obligation to pay unless and until the government has determined that a fine must be paid.

The existence of an obligation is crucial. As the Supreme Court has observed, the FCA is not "a vehicle for punishing garden-variety . . . regulatory violations." *Universal Health Servs.*, 579 U.S. at 194. Accordingly, "[w]here a complaint 'makes no mention of any financial obligation that the [defendants] owed to the government,' . . . a court should dismiss the reverse false claim." *Foreman*, 19 F.4th at 119 (quoting *Wood ex rel. United States v. Applied Rsch. Assocs., Inc.*, 328 F. App'x 744, 748 (2d Cir. 2009) (summary order)).

On appeal, Miller argues that she sufficiently alleged that Citibank had an obligation, or established duty, to pay because Citibank's conduct violated the 2015 Consent Orders, triggering "mandatory payment provisions" or "immediate liability" under the FDIA. Appellant's Br. at 9-10. Her argument hinges on the statutory language that a bank that violates a final order "*shall*

*forfeit and pay* a civil penalty." 12 U.S.C. § 1818(i)(2)(A)-(C) (emphasis added).

That language appears three times in a subsection on civil money penalties, once in each of the three penalty tiers. *See id.* While Miller did not press this argument in the district court until her motion for reconsideration, her complaint alleges that violations of the 2015 Consent Orders subjected Citibank to "civil money penalties" under 12 U.S.C. § 1818. J.A. at 24.[6] Even assuming the argument is properly before us, it fails because the FDIA does not trigger mandatory payment provisions or immediate liability.

While the FDIA's "shall forfeit and pay" language, by itself, could arguably be read to require immediate and mandatory penalties, *see Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) (describing "shall" as mandatory language); *but see De Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (observing that "legal writers sometimes use . . . 'shall' to mean 'should,' 'will,' or

---

[6]     Miller made several arguments below. First, in her motion for a share of the 2020 OCC Penalty, she claimed that "liability may be based on a contingent duty imposed by the government." No. 19-cv-10970, Docket No. 21-2 at 20. Second, in her opposition to Citibank's motion to dismiss, she claimed that she adequately alleged an obligation to pay by (1) describing the 2020 OCC Penalty, which Citibank paid, and (2) referring to "Citibank's obligation to pay fines and penalties if it violated the 2015 Consent Orders." Docket No. 53 at 13-14. On appeal, Miller "maintains that the reverse false claims provision does cover certain contingent liabilities," even as she argues that she adequately alleged an obligation to pay under the FDIA. Appellant's Reply Br. at 1 (emphasis omitted).

even 'may'"), we do not read the words in a particular section of a statute in isolation. Instead, as the Supreme Court instructed in *Robinson v. Shell Oil Co.*, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." 519 U.S. 337, 341 (1997); *see also Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) ("The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.").

Here, the statutory context makes clear that these penalties are not mandatory, but discretionary. First, other subsections of 12 U.S.C. § 1818 related to the enforcement process use the term "may" to modify what the OCC has the authority to do. If the OCC believes a bank "is violating or has violated . . . a law, rule or regulation," it "*may* issue and serve upon the [bank] a notice of charges in respect thereof." *Id.* § 1818(b)(1) (emphasis added). After issuing a cease-and-desist order, the OCC "*may in its discretion* apply to the [applicable] United States district court . . . for the enforcement of any effective and outstanding notice or order issued under this section." *Id.* § 1818(i)(1) (emphasis added). Finally, after describing the civil money penalties that a bank "shall forfeit and pay," the

statute provides that the OCC "*may* compromise, modify, or remit any penalty which such agency *may* assess or had already assessed." *Id.* § 1818(i)(2)(F) (emphases added). The repeated use of the term "may" implies discretion, *see Maine Cmty. Health Options*, 590 U.S. at 310, and undercuts Miller's claim that the "shall forfeit and pay" imposes mandatory penalties.

Second, the statute explicitly gives the OCC the authority to "compromise, modify, or remit any penalty" that the OCC "may assess or had already assessed under subparagraph (A), (B), or (C)." 12 U.S.C. § 1818(i)(2)(F). As described above, "remit" means to "pardon or forgive," *Kasowitz Benson Torres*, 929 F.3d at 725-26, and subparagraphs (A), (B), and (C) contain the "shall forfeit and pay" language on which Miller relies. Put simply, the OCC has the discretion *not* to impose a penalty that the FDIA states a bank "shall forfeit and pay." *But see Customs Fraud Investigations*, 839 F.3d at 246 (concluding that "[i]mposition of [a customs] duty is non-discretionary since, by statute, such duties '*shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause.*'" (emphasis added) (quoting 19 U.S.C. § 1304(i)). Violations of the 2015 Consent Orders, accordingly, do not trigger "mandatory payment provisions" or "immediate liability" under the FDIA. Appellant's Br. at 9-10.

Miller cites the Supreme Court's interpretation of a criminal forfeiture statute to support her argument. That statute provides that "[a]ny person convicted of a violation of this subchapter or subchapter II punishable by imprisonment for more than one year *shall forfeit* to the United States, irrespective of any provision of State law," different types of property. 21 U.S.C. § 853(a) (emphasis added). Interpreting the statute, the Supreme Court concluded: "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989). But no discretionary language of the type present in the FDIA modifies the "shall forfeit" command in the criminal forfeiture statute, and so *Monsanto* does not support Miller's argument. *See* 21 U.S.C. § 853(a). And forfeiting the ill-gotten gains of one's criminal conduct is distinguishable from *possibly* being subject to a discretionary civil penalty. Miller has thus failed to allege that violations of the 2015 Consent Orders -- absent action by the OCC to

levy civil penalties for any violations -- imposed upon Citibank an obligation to pay. For this reason, she has failed to state a reverse false claim under the FCA.[7]

2. *Rule 9(b)*

A *qui tam* plaintiff also does not state a reverse false claim if the allegations in the complaint are not pleaded with the particularity required by Federal Rule of Civil Procedure 9(b). *Chorches*, 865 F.3d at 81. The district court concluded that the complaint did not meet the particularity requirement because it did "not identify any specific statement, record, or report that was falsified or withheld from the [g]overment." *Citigroup*, 2022 WL 2237619, at *4.

Miller raises two arguments on appeal. First, she contends that she adequately alleged a reverse false claim because the FCA does not require her to allege a false statement. Miller is correct that alleging a reverse false claim does not require an affirmative misrepresentation in the form of a false statement. *See* 31 U.S.C. § 3729(a)(1)(G) (imposing liability on any person who "knowingly and

---

[7] Miller's argument that the CFPB Order likewise imposes an established duty lacks statutory support. Although the CFPB Order survived the 2018 termination of the 2015 OCC Order, the CFPB is not an "appropriate [f]ederal banking agency" or "[f]ederal banking agency" as defined by the FDIA and, accordingly, does not have statutory authority to impose its penalties. *See* 12 U.S.C. § 1813(q)(1)(A), (z).

improperly avoids or decreases an obligation to pay or transmit money or property to the Government").[8]

While her complaint purports to allege a theory of liability based on concealing and/or improperly avoiding and decreasing an obligation to pay the government, the gravamen of Miller's complaint is that Citibank altered third-party compliance reports, including her own, turning them into false statements or reports. *See, e.g.*, J.A. at 13 (Citibank was "manipulating audit reports and . . . fraudulently submitting documentation to assert that they were in compliance" with various consent orders); *id.* at 25 (Citibank was "ignoring its agreements with OCC and CFPB by altering her audit and external executive summary reports to avoid red flagging third party compliance failures which were in violation of the Government's guidance and consent orders"); *id.* at 26 ("Miller witnessed, firsthand, her audit reports regarding violations with the CFPB and OCC Consent Orders and agency guidelines, being altered to provide the reader

---

[8]     As a theoretical matter, this theory of a reverse false claim -- based on improperly avoiding or decreasing an obligation to pay -- could be read to not require fraud, because it may be possible to "improperly" avoid or decrease an obligation to pay without engaging in fraud. *See United States ex rel. Takemoto v. Nationwide Mut. Ins. Co.*, 674 F. App'x 92, 95 n.1 (2d Cir. 2017) (summary order). If this theory of a reverse false claim does not include fraud, Rule 9(b)'s particularity requirement arguably would not apply. But we do not need to reach the issue because, as discussed in this section, Miller in fact alleges fraud in her complaint.

with the impression that the Third-party Supplier was not in violation regarding critical functions."); *id.* at 27 ("Miller has observed senior Citibank management suppressing Audit findings, altering reviews and minimizing audit observations to ensure that Citi is not subject to mandated fines and penalties.").  Miller was, accordingly, required to allege the false statements at issue with particularity.

Miller next argues, alternatively, that "she alleged particulars of Citibank's false statements as well."  Appellant's Br. at 21.  But, as the district court observed, Miller fails to identify any *specific* statements or reports that Citibank altered.  *See Citigroup*, 2022 WL 2237619, at *4.  Instead, she merely refers to general categories of reports, like audit reports and external executive summary reports.  Such a failure to identify a specific fraudulent statement or report, when the claim relies on one, is fatal to her reverse false claim.  *See Foreman*, 19 F.4th at 119 (dismissal appropriate where reverse false claim complaint "does not specifically reference any false records or statements." (quoting *Wood*, 328 F. App'x at 748)); *cf. Ladas*, 824 F.3d at 27 (affirming dismissal of *qui tam* complaint on 9(b) grounds based in part on district court's conclusion that relator's "claim of conspiracy to violate the FCA was deficient because the [operative complaint] 'fails to identify a specific statement where [defendants]

agreed to defraud the government.'"); *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012) ("In order to plead the submission of a false claim with particularity, a relator must identify the particular document and statement alleged to be false . . . .").[9]

More broadly, Miller's complaint fails to "state[] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Such complaints should "detail[] the specifics of a scheme" leading to the reverse false claim. *See Chorches*, 865 F.3d at 83 (noting that there was "little dispute" that relator's complaint, in a false claims case, satisfied Rule 9(b) where it named supervisory personnel who told employees to falsify information, provided both precise and approximate dates for specific instances of fraud, and detailed how the company executed its scheme).

---

[9]     Miller's complaint also contains a few allegations about Citibank's false statements made on information and belief. Such allegations are only permissible in fraud cases under Rule 9(b) when the facts are "peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 82 (quotation marks omitted). That is not the case here. Miller alleges that she "witnessed, firsthand, her audit reports . . . being altered to provide the reader with the impression that the Third-party Supplier was not in violation regarding critical functions" and "observed that her External Executive Summary reports have been altered to reduce the severity of her findings." J.A. at 26, 28. Despite her first-hand knowledge of the alleged fraud, she fails to identify any specific fraudulent reports.

Here, in contrast, Miller's complaint is premised on her allegation that Citibank hid third-party compliance failures from the government but fails to identify or describe *any* of the alleged third-party compliance failures or *any* specific statements masking the failures. The complaint is bereft of the details needed to provide Citibank with "fair notice" of her claim, *O'Brien*, 936 F.2d at 676, and instead resembles an attempt to use the litigation process to discover hypothetical wrongdoing, *Madonna*, 878 F.2d at 66. Miller's complaint thus fails to satisfy the particularity required by Rule 9(b). For this additional reason, Miller has failed to state a reverse false claim.

## B. Share of the 2020 OCC Penalty

Miller argues next that the district court erred by denying her request for a share of the 2020 OCC Penalty. We disagree. Where the government elects to pursue its claim through an alternate remedy, the question arises as to whether the relator must have pleaded a valid FCA claim in the *qui tam* action before being eligible for a share of the government's recovery from the alternate remedy. While we have not had occasion to consider the issue, other circuit courts have concluded that the relator must have pleaded a valid cause of

action.[10] District courts in our circuit have followed out-of-circuit authority to require a valid FCA claim before a relator may seek a share of an alternate remedy.[11]

We see no reason to stray from the approach of our sister circuits and district courts in our circuit. The FCA's incentives for relators "to uncover, report, and prosecute FCA claims for the benefit of the United States" should remain attractive, even though enforcement under the FCA can proceed in multiple ways. *See L-3 Commc'ns*, 921 F.3d at 14. The alternate remedy provision seeks to preserve the statute's incentives. It does so by granting the relator a

---

[10] *See United States ex rel. Newell v. City of St. Paul*, 728 F.3d 791, 799 (8th Cir. 2013) (concluding relator may not recover where his *qui tam* action was invalid because the claims contained therein were subject to dismissal under the FCA's public disclosure bar); *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 112 (3d Cir. 2007) ("Like our sister courts, we read the relevant statutory provisions to mean that a relator is not entitled to a share in the proceeds of an alternate remedy when the relator's *qui tam* action under § 3729 is invalid."); *Donald v. Univ. of Cal. Bd. of Regents*, 329 F.3d 1040, 1044 (9th Cir. 2003) ("A private party, therefore, has a legal right to recovery only from a *qui tam* action brought pursuant to § 3730(b)(1), which is in turn dependent on the private party having a valid cause of action under § 3729(a)."); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 650 (6th Cir. 2003) ("[A] threshold requirement for a relator's ability to share in the proceeds of a FCA lawsuit is to file a valid *qui tam* action . . . .").

[11] *See New York ex rel. Khurana v. Spherion Corp.*, 246 F. Supp. 3d 995, 1000 (S.D.N.Y. 2017) (collecting cases); *United States v. N. Adult Daily Health Care Ctr.*, 174 F. Supp. 3d 696, 703 (E.D.N.Y. 2016) ("The Court interprets the FCA to require a *qui tam* plaintiff to state a valid *qui tam* claim before the relator may claim any right to a share of an alternate remedy.").

share of a financial recovery secured by the government when it chooses to pursue an alternate remedy, like an administrative action, instead of intervening in the relator's *qui tam* action. But the relator has no right to a portion of a financial recovery if she failed to allege a valid FCA claim in the first place; if a valid FCA claim is lacking, there would be no recovery of which to take a share. *See Donald*, 329 F.3d at 1043 n.5 ("[W]e [have] held that a 'relator has a right to recover a share of the proceeds of the "alternate remedy" to the *same degree that he or she would have been entitled to a share of the proceeds of an FCA action*.'" (emphasis in original) (quoting *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1010 (9th Cir. 2001))); *see also Hefner*, 495 F.3d at 112 ("The statute evinces no intent to compensate relators who bring unfounded § 3729 claims . . . ."). We therefore hold that a relator must plead a valid FCA claim to be eligible to seek a share of the government's recovery under the FCA's alternate remedy provision.

Because Miller has failed to state a reverse false claim, she cannot avail herself of the FCA's alternate remedy clause. We affirm the district court's denial of her request for a share of the 2020 OCC Penalty.[12]

---

[12] Because Miller has failed to state a reverse false claim, we do not need to reach the district court's observation that the 2020 OCC Penalty was not an alternate remedy.

### C. Leave to Amend

Miller also appeals the district court's denial of her request for leave to amend her complaint. Although Federal Rule of Civil Procedure 15(a)(2) directs a district court to grant leave to amend "when justice so requires," a district court may decline to grant such leave "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quotation marks omitted). The district court properly found that Miller's complaint did not state a claim for relief under the FCA because she failed to establish that Citibank had an obligation to pay the government. The district court then determined that any amendment would be futile because Miller's complaint was "premised on a misunderstanding of the kinds of obligations covered by the FCA's reverse false claims provision." *See Citigroup*, 2022 WL 2237619, at *4. We agree.

Moreover, Miller failed to submit proposed amendments with her initial motion. *See TechnoMarine*, 758 F.3d at 505 ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint."). Though Miller did attach proposed amendments with her motion for reconsideration that contained more specific allegations,

- 38 -

they still did not cure the central deficiency that Citibank did not have an obligation to pay. In other words, even assuming Miller could plead her fraud claims with particularity, she could not plead an "obligation." The district court, accordingly, did not err by denying leave to amend because of futility. Likewise, it did not err in denying Miller's motion for reconsideration.

## *CONCLUSION*

For the foregoing reasons, the judgment of the district court is AFFIRMED.